UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHAWNA HARTWELL,

                            Plaintiff,                             Case No. 17-cv-10678

v.                                                    Honorable Thomas L. Ludington
                                                      Magistrate Judge Patricia T. Morris

HOUGHTON LAKE COMMUNITY
SCHOOLS, et al,

                            Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING PLAINTIFF'S COMPLAINT

On March 3, 2017, Plaintiff Shawna Hartwell filed a complaint against Defendants Houghton Lake Community Schools and Collins Elementary School Principal Amy Peterson (in her official capacity). ECF No. 1. Plaintiff was employed at Collins Elementary as a kindergarten teacher from August 2014 until June 13, 2016. Her probationary teaching contract was not renewed after that date. (referred to by the parties as "non-renewal" or alternatively "termination"). The complaint asserts two counts under 42 U.S.C. § 1983 for violations of the first and fourteenth amendments. *Id.* at 8, 10. Plaintiff asserts that Defendants terminated her employment because of her relationship with her husband and her stepchildren, in violation of her first amendment right to intimate association and her due process right to marry.

After several months of discovery, Defendants moved for summary judgment on September 19, 2017. ECF No. 23. Because Defendant's did not produce court ordered discovery, Plaintiff had not received complete discovery when her response brief was due. Consequently, a substantial amount of discovery was conducted after the motion for summary judgment was briefed. Defendant Amy Peterson was deposed as well as Susan Tyer, superintendent of Houghton

Lake Community Schools. Teacher evaluations were finally produced, well after Defendants were directed to produce them. The document production submitted by Defendants was missing two of the five years of evaluations that were ordered to be produced. Plaintiff also learned of the existence of additional documentation they had timely sought, but that Defendants did not produce. Once Defendants did produce these documents, several months after the initial discovery deadline, Plaintiff sought leave to supplement her response to the motion for summary judgment to incorporate additional information learned during discovery. ECF No. 38. In lieu of granting that request, the briefing on the motion for summary judgment was stricken in its entirety, the scheduling order was adjourned, and a new dispositive motion deadline was set. Defendants filed their new motion for summary judgment on December 12, 2017. ECF No. 46. Plaintiff responded on January 2, and Defendants replied on January 11. ECF Nos. 49, 51.

## I.

Shawna Hartwell ("Plaintiff" or "Mrs. Hartwell") is married to Scott Hartwell ("Mr. Hartwell"). Mr. Hartwell has two children, G.H. (age 13), and K.H. (age 10). Scott Hartwell's ex-wife, Neika Hartwell-King ("Ms. King" or "Ms. Hartwell-King"), is the mother of the two children. One of the children was a student at Collins Elementary while Plaintiff was employed there. Mr. Hartwell and Ms. King have joint custody of G.H. and K.H. The children reside with Mr. and Mrs. Hartwell part of the time, and with Ms. King part of the time, pursuant to a state court order. Plaintiff also has a son who lives with her and Mr. Hartwell.

Defendant Amy Ms. Peterson ("Ms. Peterson" or "Defendant Peterson") is the principal of Collins Elementary. Ms. Peterson was close friends with Plaintiff's mother. Hartwell Dep. at 14:19-20, ECF No. 46-3. Ms. Peterson approached Mrs. Hartwell regarding employment and

Collins Elementary, and Mrs. Hartwell was hired. *Id.* at 16:10-13. Ms. Peterson knew the Hartwells and was aware of Mr. Hartwell's divorce. *Id.* at 14:19-15:24.

At the end of her second year of teaching, Mrs. Hartwell's probationary contract was not renewed by Defendant Board of Education. Principal Peterson sent Mrs. Hartwell a letter notifying her that she was recommending against renewal based on the following: "1. Failure to provide quality instruction; 2. Failure to effectively provide classroom management; 3. Inability or unwillingness to accept constructive criticism or to follow directives when areas of concern are brought to her attention. She becomes defensive and fails to improve; 4. Failure to work cooperatively and professionally with other teachers, mentor, and administration." ECF No. 46-9. Ms. Peterson sent a letter to the board recommending against renewal of Mrs. Hartwell "because her services have been minimally effective. The rationale for this recommendation has been included in the teacher's performance evaluations." ECF No. 46-11. The board adopted the recommendation. ECF No. 46-14.

## A.

At some point during Mrs. Hartwell's employment at Collins Elementary, Ms. King began contacting Ms. Peterson and Superintendent Brent Cryderman (Cryderman) by phone and/or email regarding Mrs. Hartwell. Peterson Dep. at 37. Ms. King had concerns about her children, and specifically about Mrs. Hartwell's contact with the children at school. *Id.*

On August 11, 2015, Ms. Peterson sent the following email to Cryderman:

I have been meaning to tell you . . . Neika Hartwell[King] . . . called me a few times with concerns of Shawna Hartwell (step mom) "harassing" the children during summer enrichment. Apparently the children live with Neika and she won't let Shawna and/or Scott (biological dad) see the kids. I haven't witnessed any "harassing", but did speak to Shawna regarding the concern. Shawna told me she received a letter from Neika's attorney, both of our names were listed as being subpoenaed. I'm not sure what we would have to offer? I know Neika contacted you last year, just wanted to give you a warning.

ECF No. 49-4.

Ms. Peterson had a conversation with Mrs. Hartwell regarding Ms. King's complaints around August of 2015. *Id.* at 44-45. They discussed Mrs. Hartwell's difficulty communicating with Ms. King outside of school. *Id.* Ms. Peterson was aware that Mrs. Hartwell may have been having conversations with her step-children at lunch time or during break, but there was nothing that came to light that seemed inappropriate. *Id.*

On September 9, 2015, Mrs. Hartwell sent the following email to Cryderman:

Good evening, I spoke with Amy [Ms. Peterson] earlier and she informed me that Neika, my husband Scott's ex-wife, has been in contact with you regarding me. Amy informed me today she is worried that this is hurting my professional career. I wanted to inform you while I am still a parent, this has not affected my job. Professionally I am performing my duties as a teacher for our district. I am unable to control what Neika has or will say about me. If there is something being said that you feel I need to be aware of please let me know. Sorry there have been so many issues my husband is working on the issue, it is not in my control.

ECF No. 49-6. Ms. Peterson denies ever making the statement referenced in the email about Mrs. Hartwell's professional career being hurt as a result of issues with Ms. King. Peterson Dep. at 46. Mrs. Hartwell also testified that, during this conversation, Ms. Peterson advised her she felt it would be best if Mrs. Hartwell only spoke to the kids during her husband's parenting time. Hartwell Dep. at 33. Mrs. Hartwell understood this suggestion as a directive from a superior. *Id.* at 36-37. Ms. Peterson testified that she told Mrs. Hartwell not to contact the children while she was teaching, which Ms. Peterson intended to be limited to the school day. Peterson Dep. at 160.

On September 10, 2015, Mrs. Hartwell sent the following email to Ms. Peterson:

Hello Amy, I would like to see what memo is being added to my records. I am very concerned about the statement made earlier about this effecting my job. I spent maybe ten minutes on the phone last week during one day of professional development. And only about two minutes of that time was pd we were on a break during the rest of that time. Also I made a phone call during my prep time. Anything else I did was during my lunch or after 3:30, and I was under the impression we

were duty free at that time. As I stated previously I am sorry this is being made into a larger issue than it should but I cannot control what Neika does or says, but I should have a right to defend myself if this is going to effect me "professionally." I am very concerned about this because I put a lot of time into the school after hours and during school hours and I am unsure what I am doing wrong.

ECF No. 49-7.

Ms. Peterson denies that any memo was ever added to Mrs. Hartwell's file concerning issues with Ms. King. Peterson Dep. at 48. Ms. Peterson also offered testimony clarifying the conversation Mrs. Hartwell was referring to in the email:

what she's referencing on the conversation about the [professional development] is because she was screaming on the phone and I didn't know at the time who she was talking to. She was screaming on her cell phone to someone with other colleagues around. So I believe when she and I had that conversation about the professionalism and this it wasn't due to the nature of the conversation, it was that she was screaming at someone on her cell phone.

Peterson Dep. at 50.

On or about September 2, 2015, Ms. King came to Collins Elementary and asked to have her daughter's records transferred to Charlton Heston Academy. Hartwell Dep. at 37. Mrs. Hartwell intervened and asked the secretary not to send the transcripts because Mr. Hartwell and Ms. King were in the middle of a custody dispute, the court had not yet decided that the children could transfer schools, and Mr. Hartwell had not signed paperwork consenting to a transfer. *Id.* at 38.

On September 10, 2015 an incident occurred after school hours. Peterson Dep. at 53-54. Ms. King came to pick up her daughter, K.H., at school. *Id.* at 55. While Mrs. Hartwell was walking back to her classroom, Ms. King approached Mrs. Hartwell and told her she needed to release K.H. to her and that she was not leaving without K.H. Hartwell Dep. at 39. Mrs. Hartwell felt threatened by the encounter, as she was pregnant at the time. *Id.* She went to room zero, where K.H. was, and called the police. *Id.* at 40. Although the timeline of events is less than clear, Ms. Peterson noticed

Ms. King standing in the "pick-up line" waiting for K.H. Peterson Dep. at 54. Ms. Peterson went to locate Mrs. Hartwell and told her that Ms. King had arrived to pick up her daughter. *Id.* Mrs. Hartwell informed her that it was her husband's parenting time, not Ms. King's. *Id.* Mrs. Hartwell did not allow K.H. to leave with her mother despite Ms. Peterson directing her to do so. Hartwell Dep. at 39.  Ms. Peterson then called the police, fearing that confrontation would ensue. Ms. Peterson Dep at 55. The police officer arrived and talked to Mrs. Hartwell, Ms. King, and Ms. Peterson. He also spoke with Mr. Hartwell on the phone as well as Jennifer Councilman from friend of the court. Hartwell Dep. at 40. The police officer ultimately directed Mrs. Hartwell to allow K.H. to leave with her mother. *Id.* at 41.

On September 11, 2015, Ms. Peterson issued Mrs. Hartwell a written reprimand concerning these two incidents.[1] ECF No. 46-7. The reprimand notes: "This memo is a written reprimand in regards to maintaining your professional responsibilities during the school day and not allowing your personal matters to interfere with your teaching." *Id.*

**B.**

At the end of the '14-'15 school year (her first year of teaching and prior to any of the incidents discussed above), Mrs. Hartwell received a final evaluation score of 2.45 ("minimally effective"). Final Eval. ('15), ECF No. 46-5. At the end of the '15-'16 school year, she received a final evaluation score of 2.0 ("minimally effective"). Final Eval ('16), ECF No. 49-11. Ms. Peterson was the evaluator during both years. *Id.* Possible scores range from 1.0-4.0. *Id.* A score of 1.0-1.49 corresponds to an ineffective rating, 1.50-2.49 corresponds to a minimally effective rating, 2.50-3.49 corresponds to an effective rating, and 3.50-4.0 corresponds to a highly effective rating. *Id.*

---

[1] As well as a third incident relating to a sign-out sheet, though the facts underlying that incident are in dispute.

The evaluation score consists of two components. One is referred to as "5D+ Teacher Evaluation Rubric," and is worth 75% of the weighted total, and the other is referred to as "NWEA DATA" and is worth 25% of the weighted total. Final Eval. ('15), ECF No. 46-5. The 5D+ score is calculated based on in class observations conducted by Ms. Peterson, whereas NWEA refers to student growth data, which is measured according to student performance on the "NWA test." Peterson Dep. at 12-13. There is no set number of observations required, but the district's goal is between two and six per teacher per year. *Id.* at 12. Ms. Peterson would periodically observe teachers during class, prepare a "scripting of the observation," send it to the teacher at the end of the session, and potentially schedule a follow up to discuss her observations. *Id.* Observation reports are then compiled into the 5D+ component of the final year end evaluation. *Id.*

During the '14-'15 school year, Mrs. Hartwell was observed on December 15, 2014 and March 3, 2015. Final Eval. ('15), ECF No. 46-5. The factual record does not contain a report for either of those observations but does contain a summary of the evaluation entitled: "Recommended Areas of Focus/Goals For the Next School Year." Final Eval. ('15), ECF No. 46-5; Peterson Dep. at 25:6-10. The summary reads as follows:

> Congratulations on completing your first year of teaching and having perfect attendance! You are an extremely hard worker and as you gain classroom management strategies and knowledge of the curriculum, you will grow to be a great teacher. Please continue to work with your mentor, attend family nights and develop professionally by attending our district and ISD professional development. I am excited for you to have the summer to reflect and prepare for the fall. As always, please let me know if I can be of any assistance to you.

Final Eval. ('15), ECF No. 46-5.

Mrs. Hartwell also received a mid-year review in January of 2015 which Ms. Peterson characterized as a positive review "for a first year teacher," in which she noted "I look forward to seeing continued growth and impact on student achievement with improvements in classroom

management and student engagement." Peterson Dep. at 20-21, Mrs. Hartwell received a 2 out of 4 (minimally effective) for the 5D+ component of the year end evaluation, accounting for 75% of the weighted total. Final Eval. ('15), ECF No. 46-5. For NWEA data (student performance), Mrs. Hartwell received scores of 4 out of 4 (highly effective) and 3 out of 4 (effective), accounting for 20% and 5% of the weighted total, respectively. Thus, her final evaluation total for the '14-'15 year was 2.45 (minimally effective).

During the '15-'16 school year (Mrs. Hartwell's second year of teaching), Ms. Peterson conducted an in class observation of Mrs. Hartwell on October 19, 2015, and another on November 4, 2015. ECF No. 49-13. The observations lasted 32 minutes and 25 minutes, respectively. *Id.* During the observations, Ms. Peterson would record contemporaneous notes in a program called Pivot regarding what she observed. She would also leave specific comments for the teacher in a section entitled "Noticing/Wondering." Teachers would then log into the program later on, review the comments Ms. Peterson made, and respond. *Id.* The comments and responses for Mrs. Hartwell's October 19, 2015 observation were as follows:

> Noticing/Wondering: I notice the learning target is posted, but wasn't clearly stated in your lesson. I wondered if you could review the learning target during the lesson?
>
> Response: Yes, we start the lesson off with 'what we will do today.' I will add that to the middle of my lesson as well. I thought that I said that when I said we were going to work on writing the letter Rr. I will work on that.
>
> Noticing/Wondering: I noticed the first worksheet was from Saxon Phonics and I wondered if the other 2 were as well? I also noticed students were sitting when I arrived at 8:50 and still sitting 30 minutes later and wondered if this was too long to sit?
>
> Response: The other two are not from the Phonics program it is just something that all of Kindergarten does extra.
>
> Noticing/Wondering: Hi Shawna, I enjoyed observing your phonics lesson today. Please respond to the wonderings by Wednesday of this week. We

can also meet to review. I would also like to meet to answer your questions to the recent response. Please let me know when you would like to meet. These should be two separate meetings. Thanks!

Response: When would you like to meet regarding moving Anthony's seat? Also no my MOBI is not working right now. I do not think my pen was charging. I was going to try one more time of charging it, then I was going to put a work order in. It is plugged in and charging now.

The comments and responses for the November observation were as follows:

Noticing/Wondering: I noticed your math learning target is posted and I wondered if you could use any other verbal or visual strategies for student understanding of the target and could you check for that understanding.

Response: I try to say the objective at the beginning of the lesson, and then during the debrief and exit ticket I am checking for understanding. Would you have some ideas for verbally or visually showing the target?

Noticing/Wondering: I noticed you gave the students directions to 'put the towers in order' and I wondered what your strategy is for checking their understanding of knowing the directions. I wondered if maybe this would be a good time to turn, talk and share, just to clarify the directions.

Response: Okay, I did not think about that. I have them turn and talk at the end, but yes to check for understanding before the beginning would be very helpful for most.

Noticing/Wondering: Hi Shawna, Please respond to the wonderings by the end of the week.

Response: If you have a chance we can meet and discuss some ideas for the learning targets, as well as, my response to your email.

*Id.* Ms. Peterson testified that she did not consider Mrs. Hartwell's responses defensive, and the only concerned she had was that she "didn't see the change happen with the learning target" between the two observations and she had to address it again. Peterson Dep. at 94.

Ms. Peterson followed up on the November evaluation with an email that reads as follows:

Hi Shawna, You and your students are growing! (no pun intended!) I have sent your observation to you, please respond to the wonderings. Your directions are clear and firm, your students are responding appropriately. Please be careful with the "extra explanation" after the directions. It's usually more effective to stick to the clear,

firm direction. Your have grown in this area, just be careful about the extra words they may not hear. We can meet for a few minutes and discuss your observations . . .

ECF No. 49-11

Ms. Peterson also gave Mrs. Hartwell a midyear review on January 29, 2016, which reads

as follows:

> You are receiving this mid-year review because of the "minimally effective" rating you received in the spring of 2015 as a first year teacher. Per our discussion on the observation cycle, you are currently making progress toward your goals of sharing your learning target and communicating with parents. I do still have some concerns about your professionalism outside of the classroom and management within the classroom. I also have concerns of your difficulty taking constructive feedback from other adults without becoming defensive. Please let me know if there are any additional supports that we can offer to assist you.

ECF No. 46-8.

On January 29, 2016, Mrs. Hartwell and Ms. Peterson met to discuss the review. Hartwell

Dep. at 59. At her deposition, Mrs. Hartwell gave the following account of that meeting:

> I had asked her what it was going to take for us to move on from me telling her no regarding the September 10th issue with [K.H.] And – because she had stated to me that she did not want to deal with – she – again, not verbatim word for word – but she did not want to deal with me for the next four years. And I asked what it was going to take to move on. I was following all of her rules, I was not signing – making any parenting changes, I was not calling – I did not attend parent-teacher conferences. I didn't know what else to do to abide by what she was telling me to do.

*Id.* at 58–59.

During her deposition, Ms. Peterson explained her concern with Mrs. Hartwell being

defensive and not being receptive to feedback or amenable to change. When asked to give an

example, Ms. Peterson replied "If maybe we would see – if I would see something happening in

her classroom and I would suggest a strategy for improvement, it seemed like she had already tried

that, no that's not going to work and would become defensive." Peterson Dep. at 16:24.

Mrs. Hartwell ultimately received a 2.0 (minimally effective) on her year-end evaluation for the '15-'16 school year, consisting of a 2.0 for the 5D+ rubric and a 2.0 for student growth data. ECF No. 49-12. 67% of her students met their learning target for the year.[2] *Id.* The final evaluation contains a series of "summative results" and corresponding comments Ms. Peterson left for Mrs. Hartwell. Under "Purpose", Ms. Peterson commented: "Lessons are usually linked to previous lessons. I observed the learning target being shared more often in math than reading." *Id.* Under "Student Engagement" Ms. Peterson commented: "I noticed students being more engaged in your classroom after you made some changes to your room arrangement. I would have liked Alicia[3] to be in your classroom earlier in the year, rather than waiting until May." *Id.* Under "Classroom Environment and Culture" Ms. Peterson commented: "Classroom management continues to be a concern, *which is very common for new teachers*. Quite often, it's more about how your react to the Inappropriate behavior. This year, I noticed you raising your voice more often and using negative language with your students and displaying your frustration with your students." *Id.* (emphasis added). Under "Professional Collaboration & Communication" Ms. Peterson commented:

> Your ability to work hard is certainly your strength. I appreciated the time you spent at the START training and the PBIS leadership training. I was beginning to see some stress with your kindergarten team toward the end of the year involving sharing materials and documents. We had many conversations about your professionalism in and out of the classroom, including not following a directive.

*Id.*

Ms. Peterson and Mrs. Hartwell testified that the directive Ms. Peterson was referring to was the directive for her to release K.H. to her mother on September 10, 2015. Peterson Dep. at

---

[2] Ms. Hartwell was out on maternity leave for twelve weeks between late December and late March, during which time a substitute teacher filled in for her. Peterson Dep. at 85, 99, 108; Compl. at 6.

[3] Alicia is one of the math coaches at the school who taught a lesson in Mrs. Hartwell's classroom. Hartwell Dep. at 63.

108; Hartwell Dep. at 91. They also both testified that there were no other directives given to her that she did not follow. Peterson Dep. at 108, Hartwell Dep. at 91. Mrs. Hartwell testified that, during her mid-year review, she and Ms. Peterson had also discussed "following directions from adults" and "taking constructive feedback from adults without becoming defensive." *Id.* at 92. She testified that this discussion also concerned her refusal to release K.H. on September 10, 2015 to her mother. *Id.* at 92.

Finally, under "Evaluation Comments" Ms. Peterson commented: "Classroom management and professionalism continue to be concerns as you finish your 2nd year of teaching at Collins Elementary. Your resistance to accept feedback to grow your instruction in the classroom also continues to be a concern, especially as a new teacher." *Id.*

Mrs. Hartwell testified that she was told that a first year teacher "could not be anything more than minimally effective or we would not have room to grow." *Id.* Ms. Peterson did not confirm this, but did indicate that it is not uncommon for a first year teacher to get a minimally effective rating, and that "many new teachers in the district are rated minimally effective," but not all. Peterson Dep. at 22, ECF No. 46-4; June 13 Letter, ECF No. 49-15. Ms. Peterson testified that she has never had a first year teacher rated "highly effective" Peterson Dep. at 28. She also indicated that only one first year teacher was rated "effective" in each of the two years of Mrs. Hartwell's employment. June 13 Letter, ECF No. 49-15. When asked "is a second year teacher getting a minimally effective rating unheard of?" Ms. Peterson responded: "the others that had received minimally effective the first year had received effective the second year." *Id.* at 111. When asked "so Shawna was the only one, in your school at least, that had received minimally effective two years in a row?" Ms. Peterson responded "I'm not sure. I mean, I think you have all

their evaluations and it's something we could go back and look at. But I know she was one of the only ones." *Id.* at 112.

The factual record reflects that one teacher resigned in '15-'16 after three years with an "ineffective" rating, the lowest of the four possible ratings. June 13 Letter, ECF No. 49-15. The teacher was tenured, though Ms. Peterson did not file tenure charges[4] against him nor did she consider doing so. Peterson Dep. at 131-132. The evidence further reflects that a probationary teacher at the middle school received "minimally effective" ratings during each of her first two years ('14-'15 and '15-'16), receiving a component score of 2.0 and 2.25 respectively, whereas Mrs. Hartwell received component scores of 2.45 and 2.0, respectively. Lund Eval., ECF No. 49-16. The teacher is still employed at the middle school. Mrs. Hartwell is the only teacher Ms. Peterson recommended that the Board not renew in the '15-'16 school year. Peterson Dep. at 112. Ms. Peterson testified concerning seven probationary teachers she had reviewed as minimally effective, all of whose contracts were renewed by the district unless they left of their own accord.

Superintendent Tyer's deposition testimony provides additional information about the district's practice concerning the renewal of probationary teachers. Ms. Tyer testified regarding her eight year tenure as principal of Houghton Lake Middle School. She testified concerning three probationary teachers she had rated minimally effective, all of whose contracts were renewed unless they left of their own accord. Tyer Dep. at 23-27. She also testified that, during her eight years as the middle school principal and two years as assistant principal, all probationary teacher contracts were renewed unless they left of their own accord. *Id.* at 29. She further testified that she had been serving as Superintendent of the district for approximately one year and, during that time, the district renewed all probationary teacher contracts unless a teacher left of their own accord. *Id.*

---

[4] Instituting "tenure charges" is the process by which a tenured teacher is terminated.

Peterson testified concerning the reasons that motivated her decision to recommend non-renewal of Mrs. Hartwell. She testified that her decision was motivated by the four reasons outline in the June 9, 2016 letter she sent to Mrs. Hartwell, namely: 1. Failure to provide quality instruction; 2. Failure to effectively provide classroom management; 3. Inability or unwillingness to accept constructive criticism or to follow directives when areas of concern are brought to her attention. She becomes defensive and fails to improve; 4. Failure to work cooperatively and professionally with other teachers, mentor, and administration." ECF No. 46-9; Peterson Dep. at 123.

Ms. Peterson also sent a recommendation letter to the board. ECF No. 46-11. The letter to the board did not include the four reasons for non-renewal contained in the June 9 letter she sent to Mrs. Hartwell. The letter to the Board stated that she was recommending against renewal because Mrs. Hartwell's "services have been minimally effective," and that "The rationale for this recommendation has been included in the teacher's performance evaluations. ECF No. 46-11. The evaluations and observations were not provided to the Board, nor was the mid-year review because the Board did not request them. Peterson Dep. at 122. Mrs. Hartwell also sent correspondence to the Board explaining why her contract should be renewed.[5] Ms. Peterson sent the Board a letter with her response to Mrs. Hartwell's letter. ECF No. 49-15. The letter notes that when Mrs. Hartwell initially applied during the summer of 2014, a committee of 6 people chose to not hire her, though she was ultimately hired two days into the school year due to an increase in Kindergarten numbers. *Id.* The letter also noted Mrs. Hartwell had difficulty following directions or accepting feedback without becoming defensive. *Id.* The letter also noted that Mrs. Hartwell did not use her instructional coach until May of 2016. Finally, the letter discussed the September 11,

---

[5] This correspondence has not been provided.

2015 incident as well as Mrs. Hartwell's instruction to the secretary not to transfer K.H.'s records. *Id.* Although Ms. Peterson testified that she did not take the record transfer issue into consideration when making her decision to recommend non-renewal, she stated that she still included that information in her letter to the board "because it was something that [she] thought they needed to know about." Peterson Dep. at 136–37. Ms. Peterson also attended the closed session along with Mrs. Hartwell and answered the Board's questions. *Id.* On June 13, 2016, the Board issued a resolution adopting the recommendation to non-renew Mrs. Hartwell's probationary contract. ECF No. 46-14.

## II.

### A.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**B.**

42 U.S.C. § 1983 provides a private cause of action for individuals to enforce their constitutional rights (and some federal statutory rights) against state actors who deprive them of said rights under color of state law. These state actors include municipalities and state and local officials, among others. To assert a cause of action under section 1983 a Plaintiff must 1) identify a constitutional or federal statutory right that has allegedly been infringed, and 2) identify conduct that constitutes statute action under color of law. *See* 42 U.S.C. § 1983.

The Supreme Court has noted that determining whether state action exists involves a case by case inquiry: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). Although state employees are presumed to be state actors, cloaked with the power of the state, not all actions of state employees are state actions. The actor must not only be cloaked with state authority, but must also "exercise it in relation to" the conduct at issue. *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995). "It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the officer has acted under color of law." *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975).

**C.**

Freedom of association encompasses both the freedom of expressive association and the freedom of intimate association. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617 (1984). The freedom of expressive association includes the right to engage in activities protected by the first amendment such as speech and religion. *Id.* The freedom of intimate association protects the right to maintain certain intimate human relationships, free from intrusion by the government. *Id.*

Not every relationship is entitled to constitutional protections. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 620, (1984). Relationships entitled to constitutional protection "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* The types of personal relationships that qualify for constitutional protection "attend the creation and sustenance of a family" including marriage, childbirth, raising and educating children, and cohabitation with relatives. *Id.* at 619; *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 598 (6th Cir. 2013).

The right to familial association is firmly established, though there is debate regarding where that right is grounded in the constitution. *Vigil v. S. Valley Acad.*, 247 F. App'x 982, 988 (10th Cir. 2007). Some courts have analyzed intimate association under the first amendment. *See, e.g.*, *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 415 (6th Cir. 2011); *Piscottano v. Murphy*, 511 F.3d 247 (2d Cir. 2007). Other courts have analyzed intimate association as fundamental element of personal liberty under the due process clauses. *See Kolley v. Adult Protective Servs.*, 725 F.3d 581, 587 (6th Cir. 2013); *see also Anderson v. City of LaVergne*, 371 F.3d 879, 881-82 (6th Cir. 2004) (noting that an intimate association claim is a privacy interest derived from the Fourteenth Amendment and related to the First Amendment).

### i.

Where a plaintiff challenges a restriction on their right to intimate association, the same analysis applies to the challenged government action "regardless of the precise constitutional provision undergirding that right." *Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996). The same analysis also applies to government actions burdening the right to marry, which is "both a fundamental substantive due process and associational right." *Montgomery*, 101 F.3d at 1124 (citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967)); *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d

400, 412 (6th Cir. 2011) (applying first amendment retaliation framework to a retaliation claim based on the right to marry).

Government action that constitutes a "direct and substantial interference" with the right to associate is reviewed under a strict scrutiny standard, whereas lesser interferences are reviewed for a rational basis. *Beecham v. Henderson Cty., Tennessee*, 422 F.3d 372, 376 (6th Cir. 2005); *Jones v. Perry*, 215 F. Supp. 3d 563, 569 (E.D. Ky. 2016). Governmental action constitutes a direct and substantial burden on intimate association "only where a large portion of those affected by the rule are absolutely or largely prevented from forming intimate associations, or where those affected by the rule are absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population . . ." *Beecham*, 422 F.3d at 376. Importantly, rational basis review is satisfied so long as there is a "plausible policy reason" for the government action, irrespective of whether that reason actually motivated the decision maker. *Wright v. Genesee Cty. Corp.*, 659 F. Supp. 2d 842, 851 (E.D. Mich. 2009); *Pucci v. Michigan Supreme Court*, 601 F. Supp. 2d 886, 904 (E.D. Mich. 2009); *Whitney v. City of Milan*, 720 F. Supp. 2d 958, 964 (W.D. Tenn. 2010) (citing *U.S. v. Lopez*, 514 U.S. 549 (1995)).

Challenges to governmental action that interfere with the exercise of fundamental rights most often arise in the context of challenges to governmental policies or rules, such as an employer's anti-nepotism policy. *See, e.g.*, *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004); *Montgomery*, 101 F.3d at 1124; *Pucci v. Michigan Supreme Court*, 601 F. Supp. 2d 886 (E.D. Mich. 2009). However, the same analysis applies whether the government action at issue is an isolated decision or a broad-ranging policy. *Montgomery v. Carr*, 101 F.3d at1127–28 (6th Cir. 1996) ("whatever the form of governmental action involved, legislative or executive, general or isolated, rational basis scrutiny will apply to the rationales offered by the government defendants

in cases presenting a claim that a plaintiff's associational right to marry has been infringed, unless the burden on the right to marry is "direct and substantial").

**ii.**

Where a plaintiff alleges that an adverse action was taken against them because they exercised their right to intimate association, courts have analyzed the claim under first amendment retaliation jurisprudence. *See Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 414 (6th Cir. 2011); *Sowards v. Loudon Cty., Tenn.*, 203 F.3d 426, 432 (6th Cir. 2000); *Dohner v. Neff*, 240 F. Supp. 2d 692, 701 (N.D. Ohio 2002); *Adkins v. Bd. of Educ. of Magoffin Cty., Ky.*, 982 F.2d 952 (6th Cir. 1993). To establish a prima facie case for retaliation, a plaintiff must prove: 1) the plaintiff engaged in protected conduct; 2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) the protected conduct was a substantial or motivating factor in the adverse decision. *Gaspers*, 648 F.3d at 414; *Sowards*, 203 F.3d at 432; *Adkins*, 982 F.2d 952. Exercising one's constitutional right to marry or intimately associate with others constitutes protected conduct for the purposes of establishing a prima facie case of retaliation. *See Gaspers*, 648 F.3d at 415; *Sowards*, 203 F.3d at 433. An employer's decision not to renew a probationary teaching contract satisfies the adverse action prong. *See Gaspers*, 648 F.3d at 415; *Sowards*, 203 F.3d at 433; *Thaddeus–X v. Blatter*, 175 F.3d 378, 396 (6th Cir.1999) (en banc) (pointing to "discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote" as examples of adverse actions in the employment context). If the plaintiff establishes a prima facie case, "the defendants can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct." *Gaspers*, 648 F.3d at 412 (internal quotation marks omitted); *Sowards*, 203 F.3d at 431; *Wenk v. O'Reilly*, 783 F.3d 585, 593 (6th Cir. 2015). "Unlike the *McDonnel Douglas* burden-shifting framework,

the burden does not shift back to a plaintiff to show pretext in first amendment retaliation claims."
*Wenk*, 783 F.3d 585.

## III.

In their motion for summary judgment, Defendants contend that they have not interfered with Plaintiff's intimate relationships with her stepchildren or husband, as Plaintiff remains married to her husband and remains the step-parent of her stepchildren. Mot. Summ. J. at 16-17, 22. Thus, Defendants argue that any alleged interference caused by the non-renewal of her contract is minor, as opposed to direct and substantial, and is therefore subject to rational basis review. *Id.* at 17–18. They contend that rational basis review is satisfied, as there is a plausible policy basis for the decision, namely Plaintiff's performance reviews, failure to follow directives, and engagement in activity beyond the scope of her authority as a teacher. *Id.* They argue that the actual motivation for the termination decision is irrelevant, and only the proffered public policy reason should be considered.

Plaintiff argues that summary judgment should be denied as Plaintiff's association with her family was a substantial and motivating factor in Defendants' decision to terminate her employment. Resp. at 20–22. Thus, Plaintiff contends that the termination itself amounted to a violation of her right to intimate association, irrespective of the fact that she remains intimately associated with husband and step-children. *Id.* at 22–23. Plaintiff contends there is a question of fact remaining as to the Defendants' reason for discharging her. *Id.* Plaintiff also contends that the "direct and substantial interference" test and rational basis review do not apply because those standards apply only to official rules or policies.

Both parties confuse and conflate an interference claim with a retaliation claim. Defendants inaccurately focus on the former, and Plaintiff inaccurately focuses on the latter. The former refers

to restrictions imposed on the ability to exercise a right, while the latter refers to adverse action taken in response to the exercise of a right.

## A.

As set forth above, where a plaintiff challenges government conduct that restricts the exercise of their associational rights, courts analyze the claim under the "direct and substantial" interference test. *See Beecham v. Henderson Cty., Tennessee*, 422 F.3d 372, 376 (6th Cir. 2005); *Jones v. Perry*, 215 F. Supp. 3d 563, 569 (E.D. Ky. 2016). In the facts section of her complaint, Plaintiff recites a series of "directives" Defendant Peterson gave to her concerning what she could and could not do with respect to her step-children. Plaintiff also indicates that Defendant Peterson gave her a written reprimand for her conduct regarding her step-children. On a narrow reading of her complaint, it is not entirely apparent that Plaintiff is bringing an interference claim based on the alleged restrictions of her right to engage in protected relationships, or solely bringing a retaliation claim based on the termination.  That is, even though Plaintiff has identified two counts they both seem to focus solely on the termination from employment. She appears to assert that the alleged individual acts (directives, written reprimands, etc.) are only relevant insofar as they furnish evidence that the termination decision was motivated by her association. Indeed, in Plaintiff's response brief, notwithstanding the allegations in the complaint, she appears to argue *against* consideration of a separate interference claim based on the individual restrictions. She argues that these individual restrictions should not be analyzed under any level of scrutiny (rational basis or otherwise), nor should the Court consider whether they constitute a direct or substantial interference with her rights. Resp. at 26-28. Plaintiff contends that line of inquiry only applies to official government "rules" or "policies" and that no such rule or policy is being questioned here. *Id.* at 27.

As explained above, the law is clear that government action, even in isolation (even if not taken pursuant to an official rule or policy) can constitute an unconstitutional restriction on the exercise of a fundamental right. Thus, it is not clear why Plaintiff is advocating in her response brief against the Court considering an alternative basis for relief. Although Plaintiff does not address this in her response brief, the complaint alleges that undue restrictions were imposed on her relationship with her step-daughter, giving rise to a claim for interference. Accordingly, resolving Defendants' motion for summary judgment requires a determination of whether the restrictions were unconstitutional, irrespective of the termination.

**B.**

The "substantial or motivating factor" test is applied in first amendment retaliation cases, as the third element of a prima facie case of retaliation (in addition to protected conduct, and adverse action). *See*, *e.g.*, *See Gaspers*, 648 F.3d at 414; *Sowards*, 203 F.3d at 432; *Dohner*, 240 F. Supp. at 701; *Adkins*, 982 F.2d 952. Neither counts I or II of the complaint are explicitly formulated as "retaliation" claims, and the word "retaliation" never appears in the complaint. Nevertheless, Plaintiff alleges that an adverse employment action was taken against her because of her engagement in protected conduct, namely the exercise of her right to intimate association. Thus, the "substantial or motivating" factor test applies here. Similarly in *Adkins*, the court applied this test, despite never explicitly discussing "retaliation."

Although first amendment retaliation claims more commonly involve expressive association (speech, religion, etc), they are also cognizable in the context of intimate association. *See*, *e.g.*, *See Gaspers*, 648 F.3d at 414; *Sowards*, 203 F.3d at 432; *Dohner*, 240 F. Supp. at 701; *Adkins*, 982 F.2d 952. Defendant exclusively relies on the "direct and substantial interference test," arguing that there is no direct and substantial interference here as Plaintiff is still married to her

husband, and still the step-parent of her step-children. Accordingly, Defendant contends that rational basis review should apply to the termination decision. Defendant overlooks a key distinction and disregards controlling precedent that directly forecloses their argument. Here, Plaintiff is challenging an adverse employment decision which was allegedly motivated by the existence of the intimate relationship, as well as challenging restrictions on the exercise of the intimate relationship itself. This distinction was clearly articulated in *Gaspers*:

> This court explained in *Vaughn* that cases based on a challenge to a rule or decision based on marriage *per se,* such as an anti-nepotism policy, are different from cases challenging purported acts of retaliation that affect the right of marriage. The first type of case deals with "an attempt to advance legitimate government interests, necessitating rational-basis review. By contrast, the second type of case concerns an alleged intrusion onto a protected right without any policy justification." *In the second type of case, it is not necessary that the governmental act require the abandonment or dissolution of a marriage relationship as the price for retaining public employment. The right of association is violated if the action constitutes an undue intrusion by the state into the marriage relationship. In the second type of case, the loss of a job because of a protected marital relationship constitutes undue intrusion by the state in that relationship.*

*Gaspers*, 648 F.3d at 414 (emphasis added) (internal citations and quotations omitted). Thus, if Plaintiff was discharged at least in part because of her intimate relationships, this amounts to an undue intrusion. *See, e.g.*, *See Gaspers*, 648 F.3d at 414; *Sowards*, 203 F.3d at 432; *Dohner*, 240 F. Supp. at 701; *Adkins*, 982 F.2d 952. There is no need to consider the level or character of the interference caused or select a standard of review such as rational basis or strict scrutiny.

In sum, the analysis will proceed in two parts. Section IV. A. will consider Plaintiff's challenge to the specific government actions that she alleges unduly restricted the exercise of her right to a relationship with her step-children and husband, including the directives she was issued and the disciplinary letter. With respect to these challenges, the direct and substantial interference test is applicable. Section IV. B. will consider Plaintiff's first amendment retaliation claim. With

respect to that claim, the termination was unconstitutional if her association was a substantial or motivating factor in the decision.

## IV.

### A.

Plaintiff contends that Defendant Peterson unduly interfered with her right to intimate association and her right to marriage by issuing her directives concerning her step-children and issuing her a disciplinary letter (reprimand) for conduct concerning her step-children.[6] Plaintiff contends that "Defendant Peterson used her authority as Mrs. Hartwell's supervisor to dictate the terms of Mrs. Hartwell's step-parenting." Resp. at 24.  Plaintiff identifies four instances in which Ms. Peterson gave Plaintiff a directive concerning her step-children or disciplined her for conduct concerning her step children.

### i)

It is undisputed that Ms. Peterson instructed Plaintiff to release K.H. to the custody of her mother, Ms. King, when Ms. King came to pick her up from school on September 9, 2015. Peterson Dep. at 55:3–7; Hartwell Dep. at 45:8–10. It is important to note that Plaintiff does not have, nor does she contend she has, a constitutionally protected right to retain physical custody of K.H. over the objection of the custodial mother who was present. The constitutionally protected right Plaintiff does have is to intimate association with her husband and step-children, as well as the right to marriage. The threshold question in examining this assertion is the level of scrutiny to be applied. Government action that constitutes a "direct and substantial interference" with the right to associate is reviewed under strict scrutiny, whereas lesser interferences are reviewed under rational basis review. *Beecham*, 422 F.3d at 376. As Plaintiff has not been "absolutely or largely prevented

---

[6] Although it appears that all relevant conduct concerned only her step-daughter, Plaintiff and Defendants both consistently refer to "step-children" in the plural.

from forming intimate associations," or "absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population . . ." her rights have not been directly or substantially interfered with. *Beecham*, 422 F.3d at 376. Thus, rational basis review applies, which is satisfied so long as there is a "plausible policy reason" for the government action, irrespective of whether that reason actually motivated the decision maker. *Wright*, 659 F. Supp. 2d at 851; *Pucci*, 601 F. Supp. 2d at 904; *Whitney*, 720 F. Supp. 2d at 964 (citing *Lopez*, 514 U.S. 549).

Here, there was clearly a plausible policy reason for the decision. The custodial mother was present demanding to take her daughter home, and no employee of the school could deny her that right any more than Plaintiff could. If, as she claims, Plaintiff were acting solely as a step-parent, and not an employee, the school would still have a strong public policy interest in intervening on behalf of the custodial mother. The school has temporary custody of the children when they are on school property, and a responsibility to return those students to their proper legal guardian at the end of the day. The fact that Plaintiff was also an employee gives the school an even more compelling policy interest in intervening. As an employee, Plaintiff is also an agent of the school, and her actions can be imputed to them. The school had a right and responsibility to prevent Plaintiff, an employee, from retaining custody of K.H over the objection of K.H.'s custodial mother.

Plaintiff notes that it was her husband's parenting time, not Ms. King's. At various times in the case, Plaintiff asserts that she was trying to stand-up for her husband's parental rights. *See, e.g.*, Compl. at ¶ 61. *Plaintiff's* first and fourteenth amendment rights are not the same as her husband's rights, as he is the custodial father. She does not adopt his parental rights by extension.

Furthermore, her fundamental right to marry does not give her a constitutionally protected interest in ensuring that her husband's parental rights are vindicated.

In sum, Ms. Peterson's directive to Plaintiff to release K.H. to the custody of her mother involved no direct or substantial interference with her constitutional rights. If the directive caused any interference at all, it is subject to rational basis review. Rational basis review is satisfied, as there were several plausible policy reasons for the directive.

**ii)**

It is also undisputed that Ms. Peterson directed Ms. Hartwell not to have contact with her step-children during the school day. Resp. at 24; Peterson Dep. at 160:17–161:1. Plaintiff does not have, nor does she contend she has, a constitutionally protected right to communicate with her step-children during the school day. Whether preventing her from speaking to her step-children during the school day unduly burdens her right to intimate association depends on the level of scrutiny applied. Plaintiff has not been "absolutely or largely prevented from forming intimate associations," or "absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population . . ." *Beecham*, 422 F.3d at 376. That is, she has not been prevented from associating with her step-children. Thus, her right to association has not been directly or substantially burdened. *Id.* Accordingly, rational basis review applies, which is satisfied so long as there is a "plausible policy reason" for the government action, irrespective of whether that reason actually motivated the decision maker. *Wright*, 659 F. Supp. 2d at 851; *Pucci*, 601 F. Supp. 2d at 904; *Whitney*, 720 F. Supp. 2d at 964 (citing *Lopez*, 514 U.S. 549).

There are several plausible policy reasons for the decision, including keeping the children focused on their own school work and keeping Plaintiff focused on her students. Whether the communication occurred only during breaks, lunch time, or otherwise is immaterial. It is perfectly

reasonable for the principal to determine that interactions outside the classroom might make the children and Plaintiff less effective in the classroom. Given that a plausible policy reason exists, it is unnecessary to determine if it was the actual motivation for the decision. *Wright*, 659 F. Supp. 2d at 851; *Pucci*, 601 F. Supp. 2d at 904; *Whitney*, 720 F. Supp. 2d at 964 (citing *Lopez*, 514 U.S. 549). Accordingly, this directive did not unduly interfere with Plaintiff's associational rights.

### iii)

During summer enrichment, Ms. Peterson approached Plaintiff and informed her that Ms. King called Ms. Peterson and accused Mrs. Hartwell of harassing her children during summer enrichment. Hartwell Dep. at 33:11–21; ECF No. 49-4. Plaintiff's testified as follows regarding what Ms. Peterson said during the interaction.

> [Defendant Peterson] approached me regarding talking to my stepdaughter during a summer school program and had informed me that Neika had called her complaining that I was harassing the kids. *She advised saying she saw me talk to her, knew I was not harassing her, but felt that it would be best if I only talk to the children during my husband's parenting time.* I informed her that it was his parenting time, however, there was some other issues outside of school that would not be -- that where we did not have the kids that week. But I agreed. I didn't talk to them during that summer camp after that so . . .

Hartwell Dep. at 33:11–21 (emphasis added).[7] Plaintiff mischaracterizes this testimony in her response brief: "[Ms. Peterson] *directed* Ms. Hartwell not to speak with the children during Ms. King's parenting time." Resp. at 5 (emphasis added). To the contrary, the deposition testimony does not state that a directive was issued.

Two months after her deposition, and one day prior to filing her initial response brief,[8] Plaintiff executed an affidavit which also directly contradicts her deposition testimony: "When

---

[7] This testimony is consistent with what Plaintiff averred in her complaint: "Defendant Peterson informed Plaintiff *she did not believe Hartwell-King's [harassment] allegations were true*; Peterson nevertheless *advised* Plaintiff only to speak to the children during her husband's parenting time." Compl. at ¶ 22 (emphasis added).

[8] The initial briefing on the motion for summary judgment was stricken. ECF No. 25.

Principal Amy Peterson *directed* me not to have contact with my step-children during their mother's parenting time, she did not limit this directive to only during school time. It was based upon communication that occurred outside of school hours." Hartwell Aff. at ¶ 4, ECF No. 49-5. The reason for this contradiction is not explained. Accordingly, the re-characterization will be disregarded as it is an attempt to create a "sham" issue of fact. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006); *see also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 at 806 (1999) (noting that circuit courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").[9]

Plaintiff made it clear in her deposition that, although Ms. Peterson presented the statement as "advice" or as a "suggestion," Plaintiff subjectively interpreted the statement as a directive because it came from a supervisor. *Id.* at 36:16–37:13. When asked if she felt she had a choice whether to follow the suggestion or not Plaintiff further testified that "as an administrator, as my boss, I felt that this was – it was more so a directive of this is what I had to do." *Id.* 93:3–9.

Other than the fact that the statement came from a supervisor, Plaintiff identifies only one other reason why she perceived Ms. Peterson's statement as anything other than advice or suggestion. She characterized Ms. Peterson's tone as "confrontational." *Id.* at 37:12. However, such an assertion is inconsistent with her earlier testimony in which she stated that Ms. Peterson "advised saying she saw me talk to her, *knew I was not harassing her*, but felt that it would be best if I only talk to the children during my husband's parenting time." Hartwell Dep. at 33:11–21

---

[9] An affidavit is not a "sham" however, where it supplements the previous sworn deposition. *Aerel*, 448 F.3d at 908 (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).

(emphasis added). That she perceived Ms. Peterson's tone as confrontational is also inconsistent with Plaintiff's complaint in which she avers "Defendant Peterson informed Plaintiff *she did not believe Hartwell-King's [harassment] allegations were true*." Compl. at ¶ 22 (emphasis added). Her testimony was that Ms. Peterson confronted her about harassment allegations, but noted that she, Ms. Peterson, believed those allegations to be unfounded. Secondly, that Plaintiff perceived Ms. Peterson's suggestion as confrontational does not transform Ms. Peterson's statement into government action.

Based on this description, Ms. Peterson's statement did not unduly interfere with Plaintiff's constitutional rights because the statement was not government action. *Government action* that constitutes a "direct and substantial interference" with the right to associate is reviewed under strict scrutiny, whereas lesser interferences are reviewed under rational basis review. *Beecham v. Henderson Cty., Tennessee*, 422 F.3d 372, 376 (6th Cir. 2005); *Jones v. Perry*, 215 F. Supp. 3d 563, 569 (E.D. Ky. 2016). Before assessing the interference allegedly caused by Ms. Peterson's conduct, it must first be determined whether that conduct constitutes *statute action under color of law*. *See* 42 U.S.C. § 1983. The Supreme Court has noted that determining whether state action exists involves a case by case inquiry: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the state in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). Although state employees are presumed to be state actors, cloaked with the power of the state, not all actions of state employees are state actions. The actor must not only be cloaked with state authority, but must also "exercise it in relation to" the conduct at issue. *Jojola v. Chavez*, 55 F.3d 488, 494 (10th Cir. 1995). "It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or

off duty, which determines whether the officer has acted under color of law." *Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975).

Here, based on Plaintiff's own description of the statement as well as the context in which that statement was made, nothing about the statement suggests that Ms. Peterson was exercising the coercive power of the state when she made the statement. Plaintiff herself described the statement as "advice" or a "suggestion." The factual record permits no reasonable inference that the statement was *presented* as anything other than that. That Plaintiff subjectively perceived the statement differently does not transform it into a directive merely because it was made by a supervisor. *See Stengel*, 552 F.2d 438 (noting that the relevant fact is "the nature of the act performed, not the clothing of the actor or even the status of being on duty."). Secondly, based on the context in which the statement was made, there is no reasonable inference that can be drawn that the statement was intended to apply outside of the context of the school. The statement was made following a complaint by Ms. King concerning Plaintiff interacting with the children *during summer enrichment*. Ms. Peterson approached Plaintiff during that same summer enrichment and noted that she had observed such an interaction. The only reasonable inference permitted by the facts is that the communication Ms. Peterson observed also happened during summer enrichment, or shortly before or after summer enrichment on school grounds. There is no allegation that Ms. Peterson was monitoring Plaintiff away from school grounds. Nor could Plaintiff have reasonably expected that Ms. Peterson would follow her off of school grounds to ensure that her "advice" was complied with. Thus, no government action is at issue.

**iv)**

Plaintiff further avers in her complaint that Ms. Peterson told her "it may be in the best interests of Plaintiff, her newborn son, and everyone else if Plaintiff just let K.H. and G.H. live

with Hartwell-King." Compl. at ¶ 45. The factual record contains no support for this allegation, nor does Plaintiff mention this allegation in her response brief. Accordingly, it will be disregarded.

**v)**

On September 11, 2015, Ms. Peterson issued Plaintiff the following written reprimand:

> This memo is a written reprimand in regards to maintaining your professional responsibilities during the school day and not allowing your personal matters to interfere with your teaching. On two different occasions since last week (Wednesday, September 2, 2015 and Wednesday September 9, 2015), we have had conversations pertaining to this situation.
>
> You have also placed other staff members in an uncomfortable situations. On Thursday, September 9, 2015, you asked Mrs. Goodwin to not send K.H.'s record to Charlton Heston Academy, when she had been given directions by me to do so. On Wednesday September 9, 2015, you gave Mrs. Barnes a note stating K.H. would be picked up by a friend at 1:00. I had already talked to you about correspondence coming from mom or dad only. I asked you to have Scott call me with directions for dismissal. He did and said K.H. would be picked up early by a friend. According to the sign out sheets, she wasn't picked up by the friend. You signed her out after school. On Thursday, September 10, 2015, you wouldn't release K.H. to Neika when I gave you directions to do so, which resulted in a 9-1-1 emergency call to the police.
>
> Effective immediately, all correspondence and requests necessary for K.H. will need to come from their mother, Neika, or Dad, Scott. Please refrain from making any dismissal or enrollment requests to Mrs. Barnes, Mrs. Goodwin, Ms. Bachi, or any other staff members. On Wednesdays, K.H. will need to leave the building at 1:25 and not be in your classroom.
>
> I understand this is a very difficult time for you and your family. For the sake of your children, I hope you are able to come to a resolution.

ECF No. 57-1. Ms. King had requested the school transfer K.H.'s records to Charlton Heston Academy. Hartwell Dep. at 37. Mrs. Hartwell asked the secretary to wait on sending the transcripts because Mr. Hartwell and Ms. King were in the middle of a custody dispute, the judge had not yet ordered that the children could transfer schools, and Mr. Hartwell had not signed paperwork consenting to a transfer. *Id.* at 38.

As explained in section IV. A. i) above, Ms. Peterson's directive to Plaintiff to release K.H. to the custody of her mother on September 10, 2015 did not unduly interfere with her right to

intimate association. For those same reasons, the written reprimand for failure to comply with that directive also did not unduly interfere with her right to intimate association.

Plaintiff was also reprimanded for instructing the secretary not to transfer K.H.'s records to another school, and was directed to refrain from making any such instructions in the future. Plaintiff does not have, nor does she contend she has, a constitutionally protected right to issue instructions to the school secretary concerning her step-daughter's record transfer, over the objection of the custodial mother. Nor does she have a constitutionally protected right to assert the custodial rights of her husband.

The constitutionally protected right she does have is the right to intimate association with her husband and step-children. Ms. Peterson's action did not constitute an undue interference with that right. Neither the reprimand nor the directive constitute a direct or substantial interference, as Plaintiff was not "absolutely or largely prevented from forming intimate associations" nor was she "absolutely or largely prevented from forming intimate associations with a large portion of the otherwise eligible population . . ." *Beecham*, 422 F.3d at 376. Any interference caused by the government action is thus subject to rational basis review, which is satisfied so long as there is a "plausible policy reason" for the government action, irrespective of whether that reason actually motivated the decision maker. *Wright*, 659 F. Supp. 2d at 851; *Pucci*, 601 F. Supp. 2d at 904; *Whitney*, 720 F. Supp. 2d at 964 (citing *Lopez*, 514 U.S. 549).

There are several plausible policy reasons for the decision, chief among which is the desire to refrain from involving the school in parental custody disputes. K.H.'s custodial mother requested a records transfer. Whether or not K.H. could ultimately be transferred was a matter between the custodial parents and the court presiding over that matter. The school has an interest in refraining from interfering with those matters, and ensuring their employees do not do so either.

Plaintiff notes that Ms. Peterson testified it is not uncommon for step-parents to communicate with the School district about their step-children. Resp. at 6; Peterson Dep. at 72–73. Plaintiff further contends when she requested the secretary refrain from transferring the records, she was "acting as a step-parent" but was "disciplined as an employee." Resp. at 9. Throughout this case, Plaintiff has placed a lot of importance on the capacity in which she was acting. However, as an employee, she was subject to her employer's reasonable policy decisions in its operation of the school. This is true regardless of the capacity in which she felt she was acting.

The district may indeed receive frequent communication from step-parents, or even instructions from step-parents with respect to their step-children. However, where a custodial parent gives opposite instructions, the school district likely also has a policy of respecting the instructions of the custodial parent, and not the step-parent. In this situation, Plaintiff was also an employee, and the records secretary was placed in a position of receiving competing instructions from a custodial parent as well as from a school employee. Avoiding such situations is another plausible policy reason for the action Ms. Peterson took. Thus, the action did not unduly interfere with her right to intimate association.

The same analysis applies to Ms. Peterson's directive to Plaintiff to refrain from issuing dismissal instructions to any school personnel, and Ms. Peterson's insistence that those instructions come only from the custodial parents. Again, if Plaintiff were not an employee, the school could neither prevent nor forbid Plaintiff from issuing such instructions to school personnel as a step-parent. They would, of course, be free to disregard those instructions when competing instructions were given by a custodial parent. Because Plaintiff was also an employee, the school had both a right and a responsibility to forbid her from making those instructions, in order to avoid any

appearance that school employees were making decisions properly reserved for custodial parents. This is particularly true considering the incident that happened on September 10, 2015, where Plaintiff initially refused to allow K.H. to leave with her custodial mother. Thus, the school had a plausible policy objective by requiring that any enrollment or dismissal instructions from the custodial father be made by him directly, and not through Plaintiff. This requirement was not unduly burdensome on Plaintiff's associational rights.

With respect to the directive concerning K.H. leaving the building at 1:25 on Wednesday's and not be in Plaintiff's classroom, the context surrounding this directive is unclear. In her response brief, Plaintiff does not explain if she believes this directive was improper or why. Thus, it will not be addressed.

## B.

Finally it must be determined whether the termination (or "non-renewal") of Plaintiff's employment from Houghton Lake Community Schools constituted an undue interference with her associational rights or right to marry. The analysis of this issue is different because it involves no determination of the level of interference caused or the level of scrutiny to be applied. Rather, terminating an employee for exercising an associational right is presumed to be an undue intrusion on that right. *Gaspers*, 648 F.3d at 413–14; *Sowards*, 203 F.3d at 432; *Dohner*, 240 F. Supp. 2d at 701. To establish a prima facie case for retaliation, a plaintiff must prove: 1) the plaintiff engaged in protected conduct; 2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) the protected conduct was a substantial or motivating factor in the adverse decision. *Gaspers*, 648 F.3d at 414; *Sowards*, 203 F.3d at 432; *Adkins*, 982 F.2d 952. Exercising one's constitutional right to marry or intimately associate with others constitutes protected conduct for the purposes of establishing a prima facie

case of retaliation. *See Gaspers*, 648 F.3d at 415; *Sowards*, 203 F.3d at 433. Dismissal from a job satisfies the adverse action prong. *Gaspers*, 648 F.3d at 415; *Sowards*, 203 F.3d at 433. If the Plaintiff establishes a prima facie case, "the defendants can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct." *Gaspers*, 648 F.3d at 412 (internal quotation marks omitted); *Wenk v. O'Reilly*, 783 F.3d 585, 593 (6th Cir. 2015). "Unlike the *McDonnel Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in first amendment retaliation claims." *Wenk*, 783 F.3d 585.

When faced with a motion for summary judgment, Plaintiff can no longer rest on the allegations in her pleadings, but must present evidence demonstrating "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted); *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986). That is, she must come forward with affirmative evidence upon which a reasonable trier of fact could find for her.

Based on this record, no reasonable trier of fact could find that Plaintiff's intimate association or marriage were substantial or motivating factors in the decision to terminate her. That is, Plaintiff has not identified any evidence to show that she was terminated because she was the step-mother of Mr. Hartwell's children or because she was married to Mr. Hartwell. Importantly, the fact that Plaintiff took certain actions *because* she was K.H.'s step-mother and Mr. Hartwell's husband, and that Plaintiff was terminated in part *because she took those actions*, does not mean she was terminated *because* she engaged in those relationships. *Plaintiff's motivation* for her conduct and *Defendant's motivation* for terminating her employment must be distinguished. The latter is the only relevant question in this inquiry.

Plaintiff contends Defendants are unable to meet their burden as this case "is almost exclusively questions of fact." Resp. at 20. Plaintiff asserts that, "[o]bviously the basis for Plaintiff's discharge is a very important question of fact." *Id.* at 22. Plaintiff's position is that the proffered reasons for the discharge were not the actual reasons. However, Plaintiff misstates the relevant inquiry. The material question of fact that would need to be answered at trial, at least to establish Plaintiff's prima facie case, is not "what was the basis for Plaintiff's discharge," but rather "was there a causal connection between her association and her discharge." While the two questions may be related, there is an important difference. If there is no evidence that her association with her husband and step-children played any role in the decision making process, that ends the inquiry. Unless and until Plaintiff presents evidence of that causal connection, Defendants are under no obligation to explain the reasons for the termination.

Plaintiff asserts that her performance was not the basis for her termination. Resp. at 23. With respect to her first year, it is undisputed that a "minimally effected" rating is not anomalous for a first year teacher, and is perhaps the norm. Ms. Peterson testified that she has never had a first year teacher rated "highly effective" Peterson Dep. at 28. She also indicated that only one first year teacher was rated "effective" in each of the two years of Mrs. Hartwell's employment. June 13 Letter, ECF No. 49-15. Plaintiff's score of 2.45/4 was also only .05 away from a rating of "effective," and included exceptional scores for student performance data.[10] It is also true that Plaintiff's first year evaluations contained mostly positive comments, and Ms. Peterson characterized it as positive review for a first year teacher. Peterson Dep. at 20.

---

[10] Student performance on standardized tests only constitutes 25% of the weighted total, and appears to be the only objective measure by which teachers are evaluated. The other 75% is apparently based on 2-3 in-class observations by Ms. Peterson that last only 30 minutes each.

With respect to her second year evaluation, Plaintiff notes that she was on maternity leave for about three months, which calls into question whether the decline in student performance data can be attributed to her as opposed to the substitute. Plaintiff also notes that it was exceedingly rare, if not unheard of, for the district to terminate *any* probationary teachers, no matter how they were rated. Ms. Peterson testified concerning seven probationary teachers she reviewed as minimally effective, none of whom had been non-renewed. Peterson Dep. at 152–57. Mrs. Hartwell is the only teacher Ms. Peterson recommended for termination in the '15-'16 school year. Peterson Dep. at 112. Superintendent Tyer's (Tyer) deposition testimony provides additional information about the district's practice concerning termination of probationary teachers. Tyer testified regarding her eight year tenure as principal of Houghton Lake Middle School. She testified concerning three probationary teachers she had rated minimally effective, none of whom were terminated. Tyer Dep. at 23-27. She also testified that, during her eight years as the middle school principal and two years as assistant principal, no probationary teachers were terminated. *Id.* at 29. She further testified that she had been serving as Superintendent of the district for approximately one year and, during that time, the district had not terminated any probationary teachers. *Id.*

It is not clear how many of these teachers received consecutive evaluations of minimally effective or worse. Plaintiff does, however, identify one probationary teacher who received minimally effective ratings in each of the two years that Plaintiff worked, and was not terminated (and whose average composite score was in fact lower than Plaintiff's). One probationary teacher at the middle school received "minimally effective" ratings during each of her first two years ('14-'15 and '15-'16), receiving a component score of 2.0 and 2.25 respectively, whereas Mrs. Hartwell received component scores of 2.45 and 2.0, respectively. Lund Eval., ECF No. 49-16. The teacher

is still employed at the middle school.[11] In sum, it is fair to conclude that it was rare for any probationary teacher in the district to be terminated.[12]

Plaintiff also contends that her teaching evaluations themselves have no basis in fact (particularly the '15-'16 evaluation), and do not accurately reflect her capacity as an educator. Indeed, the bases for the minimally effective evaluation are open to question. One of the derogatory comments in her evaluation was poor classroom management and being short tempered. The sole bases for this was that Plaintiff let students sit too long (30 minutes), that one student moved his seat without permission, that Plaintiff told one student "stop it, be quiet," and that Plaintiff might have raised her voice. Ms. Peterson also testified that Plaintiff used "excessive worksheets" in class. Notably, Ms. Peterson's observation comments never use the word "excessive" but merely stated: "I noticed the first worksheet was from Saxon Phonics and I wondered if the other 2 were as well." ECF No. 49-13. Plaintiff responded that the worksheets were not from Phonics, but that all kindergarten teachers use them.

Plaintiff was also accused of being unable to improve or accept constructive criticism, and becoming defensive. The sole basis for the accusation that she fails to improve is that Ms. Peterson had already told her in '14-'15 to "share her learning target more", and had to tell her again in 15'-'16. Ms. Peterson felt that Plaintiff should "share her learning target more" and not just at the beginning of the lesson. Ms. Peterson explained that this means reminding the students again in the middle of the lesson what the goal of the lesson is. Plaintiff responded: "Yes, we start the lesson off with 'what we will do today.' I will add that to the middle of my lesson as well. I thought that

---

[11] One teacher resigned in '15-'16 after three years with an "ineffective" rating, the lowest of the four possible ratings. June 13 Letter, ECF No. 49-15. The teacher was tenured, though Ms. Peterson did not filed tenure charges against him nor did she consider doing so. Peterson Dep. at 131-132

[12] And, given how common it is for a first year teacher to receive a minimally effective rating, it seems highly unlikely that Plaintiff and Ms. Lund were the only probationary teachers who have ever received a minimally effective in their second year as well.

I said that when I said we were going to work on writing the letter Rr. I will work on that." ECF No. 49-13. Ms. Peterson was asked during her deposition to review Plaintiff's responses to her in-class observations and consider again whether she finds them defensive. Ms. Peterson admitted that they did not seem defensive.

This summarizes all of the "constructive criticism" Plaintiff was offered following the two in class observations during the entirety of the '15-'16 school year. Furthermore, only two in class observations were conducted, each of which lasted only 30 minutes or so. In sum, it might be fair to say that Defendants' analysis of Plaintiff's teaching performance is not particularly compelling. However, that yields no information that assists Plaintiff to establish her prima facie case. Plaintiff must provide affirmative evidence of a causal connection between her familial association and her termination.

Next, Plaintiff states as follows:

> Further, in an additional communication between Defendant Peterson and the Board which was not made available to Plaintiff during the relevant time period, the basis for the termination recommendation *included Ms. Hartwell's intimate relationships*, *especially revolving around her step-children and their biological mother*. Defendant Peterson even stated that she had disciplined Ms. Hartwell *for these reasons*. This, or course, is contrary to Defendant Peterson's testimony that Ms. Hartwell's intimate relationships were not a basis for termination, despite discussing *the matter* with the Board when it approved her recommendation.

Resp. at 23 (emphasis added).

The "additional communication between Defendant Peterson and the Board" which Plaintiff is referring to here was a letter sent from Ms. Peterson to the Board on June 13, 2016. ECF No. 49-15. The relevant portions of the letter Plaintiff is referring to are as follows:

> On the day she wouldn't give her step-children to the biological mom, I did have to call the police or I would have had a brawl with biological mom and Shawna in the halls of Collins Elementary. If I wouldn't have directed Shawna to give the children to the biological mom, she would have put the district in jeopardy of not following the law. The mom was requesting the children. The police ordered

> Shawna to release the children. Prior to this event, I specifically told Mrs. Hartwell to release the children, if biological mom came to the school. The biological mom has the right to have her children. Mrs. Hartwell ignored that directive, resulting in 9-1-1 call. You will also notice in the written reprimand, Shawna was giving our secretaries directions that were against mom's wishes, which put them in an uncomfortable place.

*Id.*

Contrary to Plaintiff's assertion, this letter does not reflect that "the basis for the termination recommendation included Ms. Hartwell's intimate relationships, especially revolving around her step-children and their biological mother." Resp. at 23. Once again, Plaintiff equates any action she took involving her step-children as an exercise of her constitutional rights, leading to her erroneous conclusion that any adverse responsive action by the Defendants was based on Plaintiff's intimate association. Plaintiff may have been motivated to intervene as she did because she was K.H.'s step-mother, and because she was married to K.H.'s father, but her motivation is not the relevant inquiry.

Plaintiff relies heavily on *Adkins*. 982 F.2d at 954. In *Adkins*, the court found that there was a question of fact for the jury as to whether Plaintiff's relationship was a motivating factor in the termination decision where her supervisor told her "I can't fire [your husband], and you're the next best thing." *Id.* That statement is a direct piece of evidence of causal connection. Plaintiff, by contrast, has offered nothing resembling that level of proof. Plaintiff also relies on *Littlejohn v. Rose*. 768 F.2d 765, 771 (6th Cir. 1985). In that case the principal testified concerning a conversation with the superintendent about the plaintiff: "I asked him what the reason was for Linda's not being recommended back, and he stated to me that it was the divorce and the rumors of, you know, that was being circulated about the divorce . . . and the image that it would present in the community." *Id.* Again, this is direct evidence that the plaintiff in *Littlejohn* was terminated because of her divorce. Again, Plaintiff has offered nothing similar to that level of proof.

In *Sowards*, the evidence was less clear than in *Adkins* or *Littlejohn*, and the Sixth Circuit still found the plaintiff should survive summary judgment. The court found that plaintiff had presented sufficient evidence for a reasonable jury to find a causal connection between a termination and plaintiff's intimate association with her husband. *Sowards*, 203 F.3d at 434 (6th Cir. 2000). The plaintiff had worked as a jail turnkey at the Loudon County Sherriff's Department for several years without issue, until her husband announced he was running for the position of Loudon County Sherriff. After this announcement, she received undesirable shift changes, was disciplined more harshly than co-workers, was told she was being watched by the sheriff's office, and had her overtime opportunities reduced. *Id.* Plaintiff's husband's campaign against the incumbent sheriff was unsuccessful, after which plaintiff was terminated on recommendation from a Sergeant, which the incumbent sheriff approved. The reason offered for the termination was the plaintiff failed to check an outstanding warrant for someone brought into custody. *Id.* The Defendant Sheriff's deposition testimony was a key fact supporting the court's holding. When asked "if Wanda Sowards had been one of [his] staunchest supporters in the last election, would [he] have looked into the basis for Sergeant Bridge's recommendation of termination rather than just more or less accepting it," he replied "I might have." *Id.*

Although the evidence in *Sowards* was less persuasive than the evidence in *Adkins* and *Littlejohn*, that court still had direct evidence of a causal connection between the termination and plaintiff's *protected activity*. The sheriff acknowledged that he might have thought more carefully about the termination if the plaintiff had supported him in the election instead of her husband. Furthermore, even the indirect evidence in *Sowards* demonstrated a connection between the protected activity and the termination. Following her husband's campaign announcement, she

began experiencing adverse actions at work, and there was no other apparent reason for the abrupt change in treatment.

In contrast to the plaintiff in *Sowards*, the only protected activity Mrs. Hartwell was engaged in, namely her relationship with her husband and step-children, did not arise during her employment. Her relationships were known to Defendant Peterson before she was hired, and Defendant Peterson was in fact the person who approached Plaintiff regarding the job opportunity. Hartwell Dep. at 14:19-20; 16:10-13. Ms. Peterson was well acquainted with the Hartwells and was aware of Mr. Hartwell's divorce. *Id.* at 14:19-15:24.

Similarly to the plaintiff in *Sowards*, Mrs. Hartwell experienced an abrupt shift in her work environment at the beginning of her second year of teaching. Plaintiff does not allege she was subject to any adverse action during her first year of teaching. By all accounts her first year of teaching went well, proceeded without incident, and she received positive reviews (for a first year teacher). Peterson Dep. at 20–21. She only alleges unconstitutional conduct by the Defendant during her second year following the incident where Plaintiff did not release K.H. to her mother. Indeed, she was issued a written reprimand 1-2 days after that incident. She was given directives concerning what she was and was not allowed to do with respect to her step-children during the school day. Ultimately she was terminated. In contrast to the plaintiff in *Sowards*, however, the change in Plaintiff's work environment appears causally related to her own conduct as an employee, and not to any protected conduct. The plaintiff in *Sowards* had taken no action that could explain her change in work environment other than being married to her husband and supporting his campaign. Thus, the instant case is readily distinguishable from *Sowards*.

Finally, Plaintiff identifies the following questions of fact that remain for trial including: "whether Ms. Hartwell's issues with Ms. King were a part of Defendant's decision; whether the

issues with Ms. King interfered with Ms. Hartwell's ability to teach; and whether Ms. Hartwell acted in an unprofessional manner by failing to keep her work life separate from her personal issues." Resp. at 26. Plaintiff appears to suggest that these "issues with Ms. King" constitute a catchall of protected activity Defendants were prohibited from considering when they terminated Plaintiff's employment. However, the constitutional parameters circumscribing Plaintiff's protected activity are not so amorphous. The only protected activity at issue is Plaintiff's step-parenting relationship with her children and marriage to her husband. Furthermore, the question at issue is not who acted "professionally" or "unprofessionally," but if there is any evidence of retaliation based on her association with her husband and step-children. Plaintiff has provided no evidence supporting a causal connection between her association and her termination, nor has she identified any other action unduly interfering with her relationships. Accordingly, summary judgment for Defendants will be granted.

## V.

 Plaintiff analyzes her fourteenth amendment right to marry claim as distinct from her first amendment intimate association claims. As the right to marry is "both a fundamental substantive due process and associational right," the analysis applies with equal force to both rights. *See Montgomery*, 101 F.3d at 1124 (citing *Loving v. Virginia*, 388 U.S. 1, 12 (1967); *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 413 (6th Cir. 2011); *Gaspers*, 648 F.3d at 412 (applying first amendment retaliation framework to a retaliation claim based on the right to marry).

Plaintiff contends that a different legal standard applies to her substantive due process claim based on the right marry. Plaintiff identifies a two part test set forth in by District of New Mexico. There the court explained that, in order to prevail on a claim of a due process violation of the right to familial association a plaintiff must prove 1) that the defendant intended to deprive the

plaintiff of a protected relationship and 2) that Plaintiff's interest in her protected relationship outweighs the state's interest in an unwarranted intrusion in that relationship. *A.M. ex rel. Youngers v. New Mexico Dept. of Health,* 117 F.Supp.3d 1223 (D.N.M 2015).

Even if this standard did apply in the sixth circuit, it does not change the outcome. For the same reasons that the factual record cannot establish that her marriage was a factor in the termination decision, there is also no evidence that Defendants intended to deprive her of that protected relationship.

## VI.

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 46, is **GRANTED.**

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED.**

s/Thomas L. Ludington<br>
THOMAS L. LUDINGTON<br>
United States District Judge

Dated: February 16, 2018

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 16, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager